# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

Case No. 13-53846
Chapter 9
Hon. Thomas J. Tucker

---

THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT,
Plaintiff

vs.

INVESTMENT COMMITTEE OF THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT,
Defendant

A.P. NO.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

---

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

Plaintiff, the Police and Fire Retirement System of the City of Detroit, complains against the Defendant, Investment Committee of the Police and Fire Retirement System of the City of Detroit, as follows:

## INTRODUCTION

1.     The Police and Fire Retirement System of the City of Detroit ("PFRS") is a pension plan and trust established by the City of Detroit Charter and Municipal Code with its offices in Detroit, Michigan.  It is governed by an appointed and elected Board of Trustees (the "Board").

2. This adversary proceeding is brought to remedy the breaches of fiduciary duty committed by the PFRS Investment Committee (the "IC") and/or its individual committee members and the PFRS Chief Investment Officer ("CIO"), obtain injunctive relief and to declare the parties' rights and responsibilities regarding the administration and operation of the PFRS pursuant to: i) the terms of the Eighth Amended Plan of Adjustment of Debts of the City of Detroit (the "Plan of Adjustment" or "Plan") (Dkt. No. 8045), confirmed by this Court's November 12, 2014 Order Confirming Eighth Amended Plan of Adjustment of Debts of the City of Detroit (Dkt. No. 8272) (effective December 10, 2014); ii) certain exhibits that are made part of the Plan of Adjustment; and iii) agreements that were executed in connection with confirmation of the Plan.

3. The relevant duties and powers of the Board and the IC are set forth in the following documents:

a. The State Contribution Agreement dated as of October 17, 2014, by and among the Michigan Settlement Administration Authority, the General Retirement System of the City of Detroit, PFRS, and the City of Detroit (the "City"). *See* Exhibit I.A.332 to the Plan of Adjustment (Dkt. No. 8045-1).

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

b. Exhibit B to the State Contribution Agreement – the PFRS Governance Terms. *See* Exhibit I.A.332 to the Plan of Adjustment (Dkt. No. 8045-1).

c. The Combined Plan (Components I and II) for the Police and Fire Retirement System of the City of Detroit, Michigan, amended and restated Effective July 1, 2014 (the "Combined Plan"). *See* Exhibit I.A.254.a to the Plan of Adjustment (Dkt. No. 8045-1).

d. The Combined Plan was further amended and restated as Exhibit E to Emergency Manager City of Detroit Order 44, Final Emergency Manager Order dated December 8, 2014 (attached as **Exhibit A**).

4. A dispute has arisen between the Board and the IC regarding the IC's unlawful efforts to dramatically increase the annual compensation of PFRS's former Deputy Chief Investment Officer ("DCIO"), Kevin Kenneally ("Kenneally"), from $166,855 to $224,000 (a 33% increase) after one year of employment.

5. The Board appropriately exercised its exclusive authority over the management and compensation of all its employees (except the Chief Investment Officer ("CIO")), and prudently refused the efforts of the IC to implement the excessive raise.

3

6.      Further, the Board, through PFRS Executive Director David Cetlinski, offered to compromise very early in the IC's unlawful campaign by offering a more reasonable compensation of $187,305, still a 12% raise.

7.      The IC summarily rejected the attempted compromise and, instead, sought to avoid the clear parameters set forth in the Plan of Adjustment by conspiring with Kenneally to terminate his employment with PFRS and on December 2, 2019 entered into an illegal "Independent Contractor Agreement" between the IC and KJK Associates, LLC ("KJK") (an entity formed by Kenneally on November 22, 2019).  A copy of the purported Independent Contractor Agreement (the "Contractor Agreement") is attached as **Exhibit B.**

8.      Kenneally resigned his employment with PFRS on December 27, 2019. At all relevant times prior to December 27, 2019, Kenneally was an employee of both the PFRS and GRS.

9.      The Contractor Agreement calls for Kenneally to provide the same services he did as an employee of PFRS only, but his compensation would increase from $166,855 (his salary as DCIO) to an excessive $285,000 per year (a 70% increase), plus an "incentive payment" representing retroactive pay for 2019 in the amount of $60,000.

10. Since in his capacity as DCIO, Kenneally also worked for and on behalf of the GRS, with GRS and PFRS sharing the cost of his employment, Kenneally's separation from the PFRS also resulted in a separation from GRS.

11. The Contractor Agreement is between only the PFRS IC and KJK.

12. One of the purported bases for Kenneally's increase in compensation was that the DCIO position was more complex because it served both the PFRS IC and GRS IC. That is not true for KJK which only works for PFRS. In practical terms, the IC has contracted with Kenneally to do half of the work he was previously performing at nearly twice the pay.

13. Despite IC Chairman Smith's request that GRS share the costs of the higher CIO and DCIO compensation costs, the GRS Board and GRS IC have refused to take any action in support of the PFRS IC's effort with respect to Kenneally.

14. Following execution of the Contractor Agreement, the IC then improperly demanded that the Board make payments to Kenneally/KJK under the terms of the Contractor Agreement out of the assets of PFRS.

15. The Board refused because the IC's scheme violates the Plan of Adjustment and the Contractor Agreement violates state and federal law as well as the Michigan Constitution.

16. Kenneally clearly does not meet the definition of an "independent contractor" and treating him as a 1099 contractor, rather than a W-2 employee,

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

exposes the Board, PFRS staff and PFRS to liability regarding state and federal taxes, unemployment insurance, workers compensation and employee benefits.

17.    The IC entered into the Contractor Agreement as a blatant circumvention of the Board's exclusive authority to hire, manage and set compensation for all employees necessary for the operation of PFRS (other than the CIO), and approve all terms of employment for those employees.

18.    By conspiring with Kenneally to resign from his employment with PFRS and entering into the Contractor Agreement, the IC has exceeded the terms of its authority under the Plan of Adjustment, State Contribution Agreement and Combined Plan, and has violated its fiduciary duty to PFRS and the active and retired police officers, firefighters and their beneficiaries it is bound to serve.

19.    In this action, the Board seeks a determination that the IC breached its fiduciary duty and a declaratory judgment that the Contractor Agreement is *ultra vires* and *void ab initio*. Additionally, the Board seeks a declaration that the sole and exclusive management of PFRS employees, except the CIO, lies with the Executive Director and the Board.

20.    The State Contribution Agreement and Combined Plan each provide that in the event the IC takes action in violation of the terms thereof, the Board "is granted the express right to seek to preliminarily enjoin such action without the need to show

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

irreparable harm." *See* State Contribution Agreement - Governance Terms, Page 5; *see also* Combined Plan §16.1, Page 40 (Dkt. No. 8045-1).

21.     Accordingly, the Board also seeks an injunction preventing the implementation and enforcement of the Contractor Agreement.

## JURISDICTION

22.     This Court retained exclusive jurisdiction over all matters arising out of and related to the Plan of Adjustment to the fullest extent permitted by law, including jurisdiction to resolve "disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan of Adjustment or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan…" *See* Plan of Adjustment, Article VII, Paragraph G.

23.     This adversary proceeding is brought under Rule 7001 *et seq*., of the Federal Rules of Bankruptcy Procedure.   It constitutes a core proceeding under 28 U.S.C. §157(b)(2)(O).

24.     Venue is proper in this District under 28 U.S.C. §1409.

## THE PARTIES

25.     The Board of Trustees of the Police and Fire Retirement System of the City of Detroit was created on July 1, 1941.  It is vested with responsibility for the general administration, management and operation of the retirement system and is an

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

investment fiduciary as defined in the Public Employee Retirement System Investment Act, as amended, MCL 38.1132 *et seq.* (the "Act").

26.     The IC was created as a committee of PFRS pursuant to the Plan of Adjustment and its related agreements and attachments on November 12, 2014 (effective February 2015) and, is also specifically defined as investment fiduciary under the Act.

27.     As part of the resolution of certain claims by the GRS, PFRS and City of Detroit retirees in the City's bankruptcy case, the State agreed to make a contribution to the Retirement Systems under the terms and conditions set forth in the State Contribution Agreement.  The State contribution is part of the agreement referred to by certain persons as the "Grand Bargain."

28.     The State Contribution Agreement requires each Retirement System to "establish an investment committee…for the purposes of making recommendations to, and approving certain actions by, the respective System's board of trustees and/or making determinations and taking action under and with respect to Investment Management, as set forth in the terms and conditions enumerated on Exhibit A and Exhibit B, respectively, each attached to and incorporated by reference into this Agreement."  (Dkt. No. 8045-1, Exhibit I.A.332).

29.     "Investment Management" is a defined term in Exhibit B to the State Contribution Agreement.

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

30.     Investment Management sets forth twelve (12) defined and limited tasks/obligations of the IC, all related to the management of PFRS assets and liabilities, none of which address in any manner the retention, management or compensation of PFRS employees.

31.     The sole purpose of the IC is to oversee and assist in managing the investment assets of the PFRS. The scope of its authority is prescribed and limited.

32.     The IC consists of nine (9) voting members: five (5) independent members who were initially appointed by this court; two (2) active police and fire employee members from the Board; and (2) retiree police and fire members from the Board. The independent members have a full vote each, while the employee and retiree members have only a one-half vote each.

33.     The current independent members of the IC are Robert Smith ("Chairperson Smith"), McCullough Williams III (Vice Chairperson), Joseph Bogdahn, Robert Skandalaris, and Woodrow Tyler.

34.     The current employee members of the IC are Matthew Gnatek and Jeffrey Pegg. Gnatek and Pegg are also Board Trustees.

35.     The current retiree members of the IC are George Orzech and Gregory Trozak. Orzech and Trozak are also Board Trustees.

36.     Ryan Bigelow is the current Chief Investment Officer for PFRS and GRS ("CIO Bigelow").

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

37. Kevin Kenneally is the former Deputy Chief Investment Officer for PFRS and GRS and is currently the principal of KJK Associates LLC ("DCIO Kenneally").

## **RELEVANT FACTS**

38. The respective powers and duties of the Board and the IC are set forth in the Governance Terms (Exhibit B to the State Contribution Agreement) and Component I of the Combined Plan.

39. In relevant part, the Governance Terms state:

a. "All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the Board in the ordinary course of its affairs." Governance Terms, Page 1.

b. "The IC may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the IC as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Plan; such engagements shall not be subject to the approval of the Board." Governance Terms, Page 3.

c. "The IC shall be an investment fiduciary to the PFRS. An IC Member or other fiduciary under the PFRS shall discharge his or her duties with

respect to the PFRS in compliance with the provisions of Public Act 314 of 1965, as amended." Governance Terms, Page 3-4.

d. "Members of the IC shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement." Governance Terms, Page 4.

e. "'Investment Management' with respect to plan assets also includes: * * * Complying with the provisions of pertinent federal, state and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines." Governance Terms, Page 5-6.

f. "The IC shall evaluate and select the CIO, set and approve and all compensation for, and terms of employment of, the CIO." Governance Terms, Page 7.

(Dkt. No. 8045-1, Exhibit I.A.332)

40. Consistent with the requirements of the Plan of Adjustment and the State Contribution Agreement, the City adopted the Combined Plan for PFRS. Adoption of the Combined Plan was a required part of confirmation of the Plan of Adjustment. In relevant part, Component I of the Combined Plan states:

a. "The Board is vested with responsibility for the general administration, management and operation of the Police and Fire Retirement System of

the City of Detroit and with the trust and investment powers conferred in this Combined Plan Document." Component I §1.4.

b. "As of the effective date of the Plan of Adjustment, but subject to consummation of the State Contribution Agreement, an Investment Committee is hereby created for the purpose of making recommendations to, and approving certain actions by, the Board of Trustees and/or making determinations and taking action under and with respect to certain investment management matters relating to the Retirement System. The creation and operation of the Investment Committee is controlled by the Governance Term Sheet." Component I §1.21.

c. "The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions, and such parties or persons may be reasonably compensated from the assets of the Retirement System. Such engagements shall not be subject to approval of the Board." Component I §1.25.

d. "The Retirement Board shall have the power and authority to manage and administer the Retirement System in accordance with the provisions of this Combined Plan Document." Component I §14.1(a).

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

e. "The Board shall have the following powers and duties: (a) exclusive authority regarding the administration, management and operation of the Retirement System… ." Component I §14.2.

f. "The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions.  * * * The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board and the chief investment officer, whose compensation shall be determined by the Investment Committee.)"  Component I §14.3.

g. "The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it."  Component I §16.4.

(Dkt. No. 8045-1, Exhibit I.A.254.a)

**41.    Accordingly, the IC is vested with the authority to hire and set the compensation for only the CIO.  The Board retained full authority to hire and**

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

**approve the compensation (as determined by the Executive Director) of all other employees of PFRS, including the DCIO.**

42.     The terms of the State Contribution Agreement also apply to GRS, and GRS has also adopted a Combined Plan and established an investment committee with the same authority outlined above.

43.     GRS and PRS share many administrative services.  For example, David Cetlinski serves as the Executive Director of both Retirement Systems.  Similarly, CIO Bigelow serves as the CIO for both Retirement Systems and answers to the PFRS IC and the GRS IC, and DCIO Kenneally served as the DCIO for both Retirement Systems prior to his resignation as part of the IC's scheme.

44.     Employees working for the Retirement Systems are paid though the City's payroll.  The City has established salary guidelines for City employees known as the "White Book" which is subject to City Council approval.  The Retirement Systems reimburses the City for these employee costs.

45.     Bigelow has been employed by the Retirement Systems since June, 2011 and was named as the CIO of both GRS and PFRS in the State Contribution Agreement.

46.     In 2018, Bigelow's salary as CIO for both Retirement Systems was $241,654.

47.    Kenneally was hired as the Retirement Systems' DCIO on February 6, 2018 at a salary of $166,855.

48.    Beginning in or about August, 2018, and over the objections of the Board, the IC began a campaign, led by Chairperson Smith and CIO Bigelow, to grant unnecessary, unwarranted and excessive raises to the CIO and DCIO.

49.    In December 2018, in an effort to justify an increase in compensation for the CIO, the IC commissioned a report from McLagen regarding the "competitive range of salary and total cash compensation" for the CIO and DCIO positions. McLagen suggested a salary range of $225,000 to $300,000 for the CIO position, and $170,000 to $210,000 for the DCIO position.

50.    At the IC meeting on December 17, 2018, the IC approved a $22,000 pay raise for the CIO, increasing his compensation to $264,000, purportedly based on the McLagen study. **Exhibit C** - December 17, 2018 IC Meeting Minutes (excerpt).

51.    Three month later, at its March 11, 2019 meeting, the IC voted to raise the compensation of DCIO Kenneally by almost $60,000, to $224,000, purportedly based on the McLagen study. The IC then approved a motion to make this pay increase *retroactive* to January 1, 2019.  **Exhibit D -** March 11, 2019 IC Meeting Minutes (excerpt).

52.    Remarkably, at the March 11, 2019 meeting, the IC also approved to a move to provide CIO Bigelow another $50,000 raise, increasing his compensation to

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

$315,000, also retroactive to January 1, 2019, purportedly to stay consistent with the treatment of DCIO Kenneally. This was the second substantial pay increase for CIO Bigelow in less than 90 days.

53. The IC took its action with respect to the DCIO compensation in disregard of the exclusive authority conferred on the Board and/or Executive Director with respect to management and compensation of employees of the Retirement Systems, other than the CIO.

54. These amounts exceed the salaries allowed by the City's White Book and also exceed the range suggested by McLagen.

55. IC members Jeffrey Pegg and Gregory Trozak voted "no" on the motion because the action improperly invaded the Board's authority and the increases were unreasonable and unwarranted.

56. Executive Director Cetlinski specifically opposed the salary increase of the DCIO, writing to the IC on March 11, 2019: "At this time I cannot endorse or concur with this increase. Mr. Kenneally has worked for the retirement system for one year and a raise of this magnitude is out of the normal scope and range. Mr. Kenneally is in a class code of EX 2 within the system compensation schedules. The salary range for that position that he was hired into and that his title was put in is $139,591 to $200,937. The increase that is proposed is well beyond the maximum rate in his class code and beyond the recommended range in the requested McLagan

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

study. I am not against giving a raise but I believe that one of this size cannot be justified. A more appropriate increase would be to stay in the salary table of his class code and increase it over time to the desired amount. My recommendation would be to take him to step 8 at $187,305." **Exhibit E -** March 11, 2019 Memo from D. Cetlinski.

57. At its March 21, 2019 meeting, the Board voted to disapprove the action taken by the IC on March 11, 2019 regarding the salary increases for the CIO and DCIO and directed its General Counsel, Ron King, to notify the IC accordingly. In addition, the Board directed Executive Director Cetlinski to work with the City's Human Resources Department to implement a study regarding compensation rates for the CIO and DCIO classifications and update the "White Book" if allowed. **Exhibit F** - March 21, 2019 Board Meeting Minutes (excerpt).

58. On April 4, 2019, then Board Chairperson Pegg wrote to the IC opposing the salary increases and set forth, in detail, the reason for the Board's disapproval. Among other reasons, the letter stated:

- The McLagan study was flawed and did not properly compare the compensation for the CIO/DCIO positions with other like-situated and comparable retirement systems.

- The compensation decisions do not comport with the City's guidelines.

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

- Under the Combined Plan, the compensation and employment terms of the DCIO fall under the authority of the Retirement System, not the IC.

- The IC took action without the participation of the GRS, leaving the PFRS trust to pay all associated costs.

*See* **Exhibit G** - April 4, 2019 letter from J. Pegg.

59.     On May 13, 2019, upon the recommendation of General Counsel and at the request of the Board, the IC held a conference with members of the Board following its regularly scheduled meeting to discuss the proposed salary increases and to explore a compromise if possible. The Board members conceded that the IC had the authority to approve and implement a salary increase for the CIO, but not for the DCIO, who is an employee of the Retirement Systems and whose compensation is subject to the approval of the Executive Director under the Plan of Adjustment and related documents cited above. The Board members continued to oppose the amount of the salary increases as excessive and not prudent or appropriate for a retirement system in a city emerging from bankruptcy.

60.     Moreover, the Board was never presented with any details of the DCIO duties and responsibilities and never presented with any other meaningful economic or non-economic justification for the compensation increase.

61.     Nevertheless, on May 13, 2019, the IC escalated the dispute by again voting to increase the CIO's salary to $315,000, effective retroactively to January 1,

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

2019. Furthermore, the IC motion at that time improperly provides that: if the increase is not approved by the GRS IC, the full amount of the increase would be covered by PFRS assets; and if the increase exceeded the salary range approved in the City's "White Book", the difference would be covered by PFRS assets. *See* **Exhibit H** - May 13, 2019 IC Meeting Minutes (excerpt).

62. In fact, the GRS IC declined to adopt the salary increase and the increase clearly exceeded the City's "White Book" salary range. Moreover, the Human Resources Department at the City expressly indicated that it would not honor the salary increases for the CIO and DCIO because the increases were significantly outside the range of what it was willing to approve.

63. As a result, while Bigelow is the CIO of both PFRS and GRS, the full amount of the salary increase implemented by the IC is unfairly being funded by assets of PFRS only, which results in PFRS's assets being illegally used for the benefit of persons other than its participants and beneficiaries.

64. By separate motion on May 13, 2019, the IC again voted to increase DCIO Kenneally's compensation to $224,000 "as an *employee/hybrid employee* depending on the administrative feasibility of doing so." (Emphasis added). As with the increase in the CIO's salary, the IC directed that this increase was to be effective retroactively as of January 1, 2019, and any amounts above what may be approved by

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

GRS, the GRS IC or the White Book was to be borne solely by PFRS. *See* **Exhibit H** - May 13, 2019 IC Meeting Minutes (excerpt).

65. By letter dated May 14, 2019, Chairperson Smith brazenly advised the Board regarding the IC's "final decision" on the matter of compensation and improperly directed the Board to process "true-up" payments to CIO Bigelow and DCIO Kenneally for the salary difference since January 1, 2019, and to increase the salary payments going forward. *See* **Exhibit I** - May 14, 2019 letter from IC Chairperson Smith.

66. On May 16, 2019, the Board voted to decline the IC's improper directive with respect to the salary increase for DCIO Kenneally. *See* **Exhibit J** - May 16, 2019 Board Meeting Minutes (excerpt).

67. At its July 22, 2019 meeting, the IC discussed whether it could retain DCIO Kenneally as an *independent contractor* in order to circumvent the Board and avoid the need to obtain Board approval of the proposed salary increase and the limitations of the City's White Book (i.e., an improper end-run). PFRS General Counsel King warned the IC that it was not advisable to retain DCIO Kenneally as an independent contractor because such an arrangement was not likely to satisfy legal tests differentiating an employee from an independent contractor.

68. Apparently dissatisfied with that advice, Chairperson Smith and the independent members of the IC, on July 22, 2019, voted to engage Special Counsel

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

"with respect to creating a compensation package for the Deputy Chief Investment Officer that is in accordance with the motion made and passed at the Committee's May 13, 2019 meeting and, further, bring forth alternatives for the best way to implement the compensation package."  *See* **Exhibit K** - July 22, 2019 IC Meeting Minutes (excerpt).

69.     On July 24, IC Chairperson Smith and CIO Bigelow retained the Gallagher Law Firm as Special Counsel to the IC.

70.     On July 26, 2019, IC Member Joe Bogdahn wrote to other members of the committee, warning:  "As I noted in our call in May, making this an independent position would be overly expensive due to the cost to replicate and administer the benefits.  Further complicating this is the 'independent contractor' standard of the IRS, and we will not meet the standard."  *See* **Exhibit L** - Bogdahn email dated July 26, 2019.

71.     On August 15, 2019, attorney Sean Gallagher appeared at the Board meeting on behalf of the IC and outlined three alternatives to implement the decision of the IC regarding the DCIO's salary increase:  (a) DCIO Kenneally would remain a City employee with any excess salary paid by PFRS; (b) the IC would hire DCIO Kenneally as an employee of the IC; or (c) the IC would retain DCIO Kenneally as an independent contractor. *See* **Exhibit M** - August 15, 2019 Board Meeting Minutes (excerpt).

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

72.     On August 19, 2019, Board Chairperson and IC Member Gnatek wrote to IC Chairperson Smith, stating that he was surprised that attorney Gallagher had appeared at the Board meeting on August 15th on behalf of the IC, as he was not aware that attorney Gallagher had been retained or that he had been asked to appear at the meeting on behalf of the IC.  Gnatek further wrote:  "Sean was asked directly whether there was a legal opinion as to whether Kevin could be hired as an independent contractor.  He would not or could not give us his legal opinion.  If such an opinion has been given, I would hope that it is shared with all IC members.  We have been advised by our general counsel and outside legal counsel that any such arrangement with Kevin will violate state and federal employment law and the POA does not give the IC the authority to do that.  As one IC member I cannot agree to a breach of my fiduciary duty and do not agree to entering into any such arrangement. We do not have authority to enter into illegal contracts. Certainly not with my support and without any discussion or action by the committee as whole.  I am not really sure where this leaves us but I am very concerned that a fraction of the IC appears to be driving an agenda without involving or consulting all members of the investment committee.  I hope we can resolve this issue without further distraction or protracted litigation."  **Exhibit N** - Matt Gnatek email dated August 19, 2019.

73.     Despite the objections and warnings clearly articulated by Board Chairperson and IC Member Gnatek, IC and Board Member Pegg, IC Member

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

Bogdhan and PFRS General Counsel King, the independent members of the IC, led by Chairperson Smith and CIO Bigelow, continued to take steps to circumvent the Board regarding DCIO Kenneally's compensation.

74. In a September 10, 2019 email, CIO Bigelow directed the Chief Accounting Officer of the Retirement Systems to process the salary increase for DCIO Kenneally approved by the IC by making a "true-up" payment of $39,734 for January 1 through September 13, 2019, and adjusting his paychecks going forward to represent annual compensation of $224,000 beginning on September 16, 2019. CIO Bigelow did this notwithstanding his knowledge that the Board had rejected the raise. *See* **Exhibit O** - Ryan Bigelow email dated September 10, 2019.

75. Executive Director Cetlinski, with support of the Board, properly declined to authorize the Chief Accounting Officer to process these excessive and unauthorized payments.

76. Prior to the Board's October 3, 2019 meeting, the IC's Special Counsel Gallagher contacted PFRS General Counsel King and *suggested* for the first time that if the Board did not comply with the demands of the IC regarding the DCIO compensation increase, the IC might not make certain compliance certifications required under the State Contribution Agreement and Combined Plan. (One of the Plan requirements is that the IC certify to the Foundation for Detroit's Future ("FDF") that the Retirement System is in compliance with the various governing

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

documents. This certification is part of FDF's determination to remit an $18.3 million annual contribution to PFRS as part of the "Grand Bargain.")

77. PFRS General Counsel King was initially dismissive of the suggestion that a dispute over employee compensation could ever result in any type of breach (material or otherwise) of any of the operative documents or that the IC, acting as a fiduciary, would somehow jeopardize funding (no matter how unlikely) to the PFRS over this issue. However, the IC continued to use this tactic to pressure the Board to go along with its scheme regarding Kenneally.

78. IC Chairman Smith contacted John Naglick, a Board Trustee and Chief Deputy CFO/Finance Director for the City, and stated that unless Naglick and the Board found a way to support what the IC wanted to do regarding Kenneally, Smith would not be in a position to certify compliance to the FDF.

79. This matter was reported in detail to the Board at its October 3, 2019 meeting.

80. Incredibly, during discussion of the FDF certification at the IC meeting on November 18, 2019, IC Chairperson Smith stated that if the Board did not comply with the IC's decision regarding Kenneally, he would be forced to "report that the System is not in a good place." This was clearly a not so veiled **threat** to the Board that he would not certify compliance with the Plan of Adjustment, thereby

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

endangering the $18.3 million required contribution to PFRS by FDF, if the Board did not acquiesce to the independent contractor scheme.

81.     On December 2, 2019, the IC entered into the Contractor Agreement with KJK, a Michigan limited liability company formed by DCIO Kenneally on November 22, 2019 for this purpose. *See* **Exhibit B** - Contractor Agreement.

82.     Chairperson Smith executed the Contractor Agreement on behalf of the IC. Notably, the Contractor Agreement was executed without prior review or input from the full IC, the Board, the Executive Director or PFRS General Counsel King.

83.     DCIO Kenneally was still an employee of the Retirement Systems when the Contractor Agreement was executed.

84.     While DCIO Kenneally was still an employee of the Retirement System, there was little to anything for the Executive Director and/or the Board to do with respect to the KJK contract.  Clearly and among other things, DCIO Kenneally could not perform and be paid under the Contractor Agreement while an employee of the Retirement Systems.

85.     At the time the Contractor Agreement was executed, IC Chairperson Smith and the members of the IC knew that the arrangement was unlikely to pass muster as an independent contractor relationship under applicable IRS and other legal standards.  IC Chairperson Smith and the independent members of the IC disregarded

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

those concerns and knowingly executed, approved and ratified the Contractor Agreement, notwithstanding the illegalities and risks to PFRS and the Board.

86. Execution of the Contractor Agreement recklessly and imprudently exposes the Board and PFRS to possible liability under a host of potential legal claims.

87. The "fee arrangement" for Kenneally is set forth on Exhibit A to the Contractor Agreement and provides KJK/Kenneally shall receive a one-time "incentive payment" of $60,000, and a monthly fee of $23,750.00 (or **$285,000 annually**). This amount is well above the $224,000 previously proposed by the IC; the increase is apparently intended to cover Kenneally's lost benefits. *See* **Exhibit B.**

88. The "incentive payment" is intended to be a form of retroactive pay for work performed by Kenneally since January 2019 as an employee of the Retirement Systems.

89. The IC does not attempt in any way to characterize the "incentive payment" as anything other than retroactive compensation. In fact, IC Chairman Smith confirmed as much to the Detroit News on December 9, 2019. *See* **Exhibit P** - Ferretti, Christine, "Detroit pension investment official to get 75% raise, signing bonus as contractor", *Detroit News*, December 9, 2019, www.detroitnews.com/story/news/local/detr0city/2019/12/09/detroit-investment-official-kenneally-raise-signing-bonus-contracotr/2633097001/.

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

90.     Such retroactive pay to a contractor clearly violates Article XI, §3 of Michigan's 1963 Constitution which provides that "[n]either the legislature or any political subdivision of this state shall grant or authorize extra compensation to any public officer, agent or contractor after the service has been rendered or the contract entered into."

91.     The Contractor Agreement provides, at Exhibit B, that KJK shall provide services as directed by the CIO, including but not limited to:  (i) identifying, reviewing and evaluating prospective investment strategies; (ii) assisting in the development of portfolio asset allocation; (iii) providing support as needed with the investment manager search and selection process; (iv) conducting on-site investments, operational and/or confirmatory due diligence with prospective managers; (v) coordinating and conducting ongoing maintenance due diligence with existing investment managers; (vi) preparing and presenting portfolio reviews; (vii) creating risk analytic and compliance reports; (viii) providing financial market commentary; (ix) assisting as needed with the review and workout of problem investments. *See* **Exhibit B.**

92.     The duties described in Exhibit B of the Contractor Agreement are a nearly verbatim recitation of the written job description for the DCIO position and the exact duties Kenneally performed as a direct employee of the Retirement Systems.

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

93.    The Contractor Agreement also provides that:   KJK shall be an independent contractor and not an employee; the IC will provide a Form 1099, not a Form W-2; and KJK is solely responsible for all taxes and is not entitled to unemployment compensation, worker's compensation, or other benefits. Contractor Agreement ¶4. *See* **Exhibit B**.

94.    In reality, **Kenneally is not an independent contractor** and would remain an employee under the Michigan "economic realities test" and applicable federal law.   Accordingly, the above provisions violate state and federal law and subject PFRS to substantial liability.

95.    The IC effectively admits the illegality of Kenneally's independent contractor status and foolish risk of liability by including, at Section 14 of the Contractor Agreement, an indemnification provision that unfairly shifts the risk of liability on this very issue to KJK/Kenneally.

96.     This provision is almost certainly unenforceable under federal and state law.

97.    Finally, the compensation under the Contractor Agreement is clearly excessive and amounts to a 70% increase over Kenneally's previous salary as DCIO for both GRS and PFRS of $166,855.

98.    The GRS investment committee prudently declined to participate in this arrangement.   As a result, under the IC's scheme, Kenneally would perform work

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

only on behalf of the PFRS, not the GRS; i.e., earning nearly twice as much money for half the work.

99.    At the December 17, 2019 special IC meeting, the executed Contractor Agreement was presented to the full IC for the first time.

100.    At the December 17, 2019 meeting of the IC, Board Chairperson and IC Member Gnatek told the other IC members that the Board would not approve payments to Kenneally under the Contractor Agreement due to concerns that the arrangement did not create a legitimate independent contractor relationship.

101.    At the December 17, 2019 meeting of the IC, PFRS General Counsel King reiterated his opinion that the Contractor Agreement did not comport with legal guidelines regarding independent contractors because the IC was merely retaining Kenneally to do the same work that he performed as an employee of the Retirement Systems.

102.    At the December 17, 2019 meeting of the IC, Board Chairperson and IC Member Gnatek suggested that the IC go to the Bankruptcy Court to resolve the independent contractor issue and the authority to set the DCIO's compensation before Kenneally resigned and placed himself at risk. IC Chairperson Smith responded that if the Board went to court he could not in good faith sign the critical certification to the FDF.  Accordingly, the IC forged ahead with its ill-advised scheme.

103.    Kenneally resigned his employment on December 27, 2019.

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

104.    KJK/Kenneally has purportedly performed work under the Contractor Agreement and submitted the following invoices to the Board for payment: (i) Invoice dated December 30, 2019 for a "Contractual Fee" of $60,000; and (ii) Invoice dated January 1, 2019 for "Contractor Fee 1/6/20 - 1/15/20" for $11,875.

105.    Under the Contractor Agreement, CIO Bigelow has exclusive oversight (with no meaningful checks and balances) over all services performed by KJK/Kenneally.

106.    The Board has declined to pay the invoices for the reasons stated above.

## COUNT I - BREACH OF FIDUCIARY DUTY

107.    The Board re-alleges the preceding paragraphs as if set forth fully herein.

108.    The Plan of Adjustment, including Section 1.21 of the Combined Plan and the IC Governance Terms at p. 6, clearly provides that the IC has a fiduciary duty to act in the best interests of the PFRS, for the protection of its assets and for the benefit of its participants - the current and former police officers and firefighters of the City of Detroit and their beneficiaries.

109.    The IC has breached its fiduciary duty to the PFRS and its participants by:

a.  Violating the Plan of Adjustment, doing an end-run around the clear authority of the Board and entering into the illegal Contractor

Agreement which subjects the Board and PFRS to substantial legal liability, as set forth above;

b. Demanding that PFRS use its limited assets to grant excessive raises to the CIO and DCIO which are unjustified by any objective measure;

c. Granting excessive raises to the CIO and DCIO without the participation of GRS, and agreeing to fund the entire increase out of the assets of the PFRS trust, so that PFRS is paying a disproportionate share for work performed for both Retirement Systems; and

d. Threatening to withhold its certification to FDF which would deprive the PFRS participants and beneficiaries of millions of dollars needed to pay benefits, simply because the Board would not acquiesce to the IC's *ultra vires* acts.

WHEREFORE, the Board requests that this Court enter an order finding that the IC breached its fiduciary duty to the PFRS and that the Contractor Agreement is null and void.

## COUNT II - DECLARATORY JUDGMENT

110. The Board re-alleges the preceding paragraphs as if set forth fully herein.

111. The Federal Declaratory Judgment Act provides courts with the authority to "declare the rights and other legal relations of any interested party

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

seeking such declaration" in any actual controversy within its jurisdiction. *See* 28 U.S.C. §2201.

112.   Here, there is an actual controversy between the parties relating to their respective rights and authority under the Plan of Adjustment, State Contribution Agreement and Combined Plan.

113.   The IC knowingly violated the Plan of Adjustment, State Contribution Agreement and Combined Plan with respect to its actions concerning DCIO Kenneally as set forth above.

114.   The IC has intentionally violated its fiduciary duty to the PFRS and its participants by violating the Plan of Adjustment, doing an end-run around the Board and entering into the illegal Contractor Agreement that subjects the Board and PFRS to substantial legal liability, as set forth above.

WHEREFORE, the Board asks this Court to enter a declaratory judgment indicating that the IC violated the Plan of Adjustment and breached its fiduciary duties, and order that the Contractor Agreement is null and void and declare that the management and compensation decisions with respect to all employees of the PFRS, except to CIO, lies within the sole and exclusive authority of the Executive Director and the Board.

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

## COUNT III - INJUNCTIVE RELIEF

115. The Board re-alleges the preceding paragraphs as if set forth fully herein.

116. The IC's breach of the Plan of Adjustment and its fiduciary duty by, among other things, entering into the illegal Contractor Agreement subjects the PFRS to substantial legal liability and economic loss, as alleged above.

117. PFRS will violate tax and employment law, and may well incur actual legal liability and economic loss, if the Contractor Agreement is permitted to take effect and be enforced.

118. The PFRS, its assets and good standing, must be protected at all times.

119. As set forth above, the Plan of Adjustment provides that the Board has "the right to seek to preliminarily enjoin [the offending] action without the need to show irreparable harm."

120. Nevertheless, the PFRS will suffer irreparable immediate harm if an injunction is not granted precluding the implementation and enforcement of the Contractor Agreement because the PFRS's good standing is essential to its funding and operations.

121. There is a strong likelihood the Board will prevail on the merits.

122. The irreparable harm that the PFRS will suffer if injunctive relief is not granted far outweighs the minimal inconvenience to the IC and Kenneally/KJK

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.

(which they caused; Kenneally could have remained employed as the DCIO) in the event it is not granted.

123.   The public, third parties, and most importantly the PFRS's participants will benefit from, and not be harmed by, the issuance of injunctive relief protecting the assets and good standing of the PFRS.

WHEREFORE, the Board requests this Court grant an injunction enjoining the implementation and enforcement of the Contractor Agreement and any work or payment in accordance with it.

**COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.**

**By:/s/ Mark S. Frankel** _____
    **David A. Lawrence (P48630)**
    **Bruce J. Lazar (P16475)**
    **Mark S. Frankel (P41565)**
    **Sarah Heisler Gidley (P53764)**
**Attorneys for Plaintiff**
**39395 W. Twelve Mile Road, Suite 200**
**Farmington Hills, MI  48331**
**(248) 489-8600**
**david.lawrence@couzens.com**
**bruce.lazar@couzens.com**
**mark.frankel@couzens.com**
**sarah.gidley@couzens.com**

**Dated:  January 28, 2020**

COUZENS, LANSKY, FEALK, ELLIS, ROEDER & LAZAR, P.C.